In re BARR LABORATORIES, INC., Petitioners.

No. 90–1402.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 19, 1991.

Decided April 16, 1991.

As Amended April 23, 1991.

---

Eric L. Hirschhorn, with whom Bruce L. Downey, Washington, D.C., was on the brief for petitioners.

Jacob Laufer of the bar of the Supreme Court of the State of New York, pro hac vice, by special leave of the Court, with whom John M. Desiderio, James S. Rubin and Steven Shapiro, New York City, were on the brief, for intervenor.

Gerald C. Kell, Atty., Dept. of Justice with whom Stuart M. Gerson, Asst. Atty. Gen. and John R. Fleder, Washington, D.C., Director, Office of Consumer Litigation Dept. of Justice and Eric M. Blumberg, Rockville, Md., Associate Chief Counsel for Enforcement, Food and Drug Admin. were on the brief, for respondent.

Before SILBERMAN, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Barr Laboratories has filed a petition in this court, see *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 74–79 (D.C.Cir.1984) ("TRAC"), seeking a writ of mandamus to compel the Food and Drug Administration to act promptly in either approving or disapproving 23 of Barr's abbreviated new drug applications and abbreviated antibiotic applications (collectively, "generic drug applications"). Though we agree with Barr that FDA's sluggish pace violates a statutory deadline, we conclude that this is not an appropriate case for equitable relief. While judicial intervention could assist Barr, it would likely impose offsetting burdens on equally worthy generic drug producers, equally wronged by the agency's delay. Moreover, while prompt disposition of Barr's applications would benefit users of generic drugs, so would the disposition of other companies' applications, which relief for Barr would further delay.

\*    \*    \*    \*    \*    \*

Under a 1984 amendment to the Food, Drug, and Cosmetic Act, 21 U.S.C. § 355 (1988), a producer of generic drugs may file applications that rely heavily on approved applications for "listed" (generally name-brand) drugs. Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585. This expedited process permits generic drug applications to piggy-back on clinical findings that FDA has already embraced. Accordingly, the application must demonstrate, among other things, that the generic drug is the "bioequivalent" of the listed drug and that it is properly manufactured and labeled. See 21 U.S.C. § 355(j)(2)(A).

Congress specified that "[w]ithin one hundred and eighty days of the initial receipt of [a generic drug] application ... or within such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall approve or disapprove the application." 21 U.S.C. § 355(j)(4)(A). Under regulations not challenged here, an applicant that files a "major" amendment to its application, either at the agency's behest or on its own initiative, is deemed to have consented to a new review period that may last up to an additional 180 days. See 21 C.F.R. §§ 314.60, 314.-100(c) (1990).

Barr claims that the FDA has repeatedly violated the 180–day deadline in processing its generic drug applications. According to Barr, the agency has (in some cases) ignored the deadline altogether and (in others) improperly skirted it by waiting until the end of the 180–day period before provisionally "denying" the applications on the basis of spurious technicalities.

The FDA contests Barr's story only in the details. Whereas Barr calculates that the FDA took an average of 336 days to process past generic drug applications, Pet.Br. at 8, the FDA sets the figure at 262 days and estimates the response times for certain pending applications at between 389 and 669 days, Resp.Br. at 7. In other words, by the FDA's own account, its expected future delay will range from more than *double* the allotted time to nearly *quadruple*. Even in the FDA's view, the delays are severe. It explains the lag as the product of a personnel crisis that began in the summer of 1988, when scandal beset its generic drug division, forcing out some employees and diverting others from their usual work. See Burlington Declaration, Exhibit B, at 9–15.

■ Effectively conceding that it has violated the 180–day provision, the government answers that the deadline is only "directory". It reasons that because Congress did not specify a "consequence" for noncompliance, the provision—though seemingly mandatory—is only a kind of policy recommendation. The cases the government cites for this idea, e.g., *Brock*

*v. Pierce County*, 476 U.S. 253, 259, 106 S.Ct. 1834, 1838, 90 L.Ed.2d 248 (1986); *Ralpho v. Bell*, 569 F.2d 607, 626–28 (D.C. Cir.1977); *Fort Worth Nat'l Corp. v. FSLIC*, 469 F.2d 47, 58 (5th Cir.1972); *Maryland Casualty Co. v. Cardillo*, 99 F.2d 432, 434 (D.C.Cir.1938), are inapposite. All of them considered the separate problem of whether, as a consequence of missing a relevant statutory deadline, an agency loses jurisdiction over a case or issue; all (unsurprisingly) rejected that view. None of the cases considered the problem at issue here: whether an agency acts lawfully in ignoring a facially mandatory statutory deadline. In fact, the court in *Fort Worth* suggested that, in general, the "proper remedy" of a party seeking to enforce a statutory deadline is not to challenge the legitimacy of post-deadline agency actions, but "to apply for a court order compelling the [agency] to act." 469 F.2d at 58. That, of course, is just what Barr is doing.

■ The issue before us, then, is not whether the FDA's sluggishness has violated a statutory mandate—it has—but whether we should exercise our equitable powers to enforce the deadline. Equitable relief, particularly mandamus, does not necessarily follow a finding of a violation: respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities. See, e.g., *In re Monroe Communications Corp.*, 840 F.2d 942, 946 (D.C.Cir.1988).

Our leading case in this area, *TRAC*, identified six principles that have helped courts determine when mandamus is an appropriate remedy for agency delay:

(1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the

court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

750 F.2d at 80 (citations and internal quotes omitted). Here we may assume that Congress's 180–day deadline indeed supplies content for item one's "rule of reason", but a finding that delay is unreasonable does not, alone, justify judicial intervention. E.g., *In re Center for Auto Safety*, 793 F.2d 1346, 1354 (D.C.Cir.1986).

*TRAC's* third factor (which overlaps with the fifth, at least in this context) asks whether the case is primarily about "human health and welfare" or "economic regulation". Here, at least, categorization of the values at stake is elusive. It is also largely irrelevant in light of *TRAC's* fourth consideration—the effect of relief on competing agency activities.

Barr's interest, we may assume, is entirely commercial. But it makes money getting useful drugs into the hands of sick people. Of course the "bioequivalents" of the drugs covered by these applications are, by definition, already available—but at a higher price, which makes the stake appear pecuniary. But for poorer people— the users for whom access to generic drugs is most important—a pecuniary saving on drugs may have important health benefits. The difference between sinking, say, 3% and 20% of one's income into pharmaceuticals spells a large difference in the range of economically accessible food and shelter.

The prevalence of health insurance hardly disposes of these complications. Much of the American population is uncovered by medical insurance—predominantly, in all likelihood, people for whom access to generic drugs is especially important. Moreover, for those who do buy private health insurance, unavailability of generic drugs spells higher premiums and again less income available for food, shelter, and every other item that may contribute to health and well-being. Similarly, given limits on congressional and taxpayer willingness to subsidize health care, the unavailability of cheap drugs means fewer resources for other aspects of health care.

But the impact of the FDA's sluggish pace on the public health is effectively irrelevant in light of our analysis of *TRAC's* fourth factor, the effect of relief on competing agency priorities. Assuming constant resources for the generic drug program, a judicial order putting Barr at the head of the queue simply moves all others back one space and produces no net gain. Agency officials not working on Barr's matters presumably have not just been "twiddl[ing] their thumbs". See *Board of Trade v. SEC*, 883 F.2d 525, 531 (7th Cir. 1989). Perhaps Congress should earmark more funds specifically to the generic drug program, cf. Intervenor's Br. at 9, but that is a problem for the political branches to work out.

If Barr had shown that the FDA had singled it out for mistreatment, judicial relief would then advance the cause of equal treatment and, despite the lack of any immediate net advancement of Congress's policy objectives, could make sense. Our cases considering agency delay have often asked whether it was "egregious", see *In re Monroe Communications Corp.*, 840 F.2d 942, 946 (D.C.Cir.1988); *TRAC*, 750 F.2d at 80; *Public Citizen Health Research Group v. FDA*, 740 F.2d 21, 34 (D.C.Cir.1984), and especially shabby treatment of one applicant would seem exactly that.

In fact, Barr's reply brief alleges that the FDA *has* vindictively singled it out for especially bad treatment. Reply Br. at 9– 10. If Barr had asserted this claim initially, we would be able to assess whether it was worth a special factual inquiry. See *TRAC*, 750 F.2d at 78. Given the vague and secondhand character of Barr's claim (Barr emphasizes a lone congressman's suspicions), that seems improbable, but as Barr raised the issue only in its reply, respect for the adversary process makes it inappropriate to address the claim at all.

See *Golden Pacific Bancorp v. Clarke,* 837 F.2d 509, 513 (D.C.Cir.1988); *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983). And absent this claim, we have no reason to think that judicial intervention would advance either fairness or Congress's policy objectives.

In short, we have no basis for reordering agency priorities. The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way. Such budget flexibility as Congress has allowed the agency is not for us to hijack. In one of the exceptionally rare cases where this court has actually issued an order compelling an agency to press forward with a specific project, *Public Citizen Health Research Group v. Auchter,* 702 F.2d 1150 (D.C.Cir.1983), we were persuaded, largely by agency concessions, that the project backed by plaintiff was plainly more "urgent" than any that the project's acceleration might retard. See *id.* at 1158. Nothing of the sort exists here. While Congress clearly intended a faster track for generic drug applications in general, it did not choose a super-priority for Barr, and it did not address the trade-off between strict compliance with the 180–day deadline and the FDA's disposition of its other projects with enough clarity to guide judicial intervention.

Barr tries to sidestep the resource-allocation issue by noting that the FDA itself has recently requested budget cuts from Congress. That request, filtered through the Office of Management and Budget, is the product of a complex set of policy trade-offs; its size does not contradict the FDA's claim that its resources are inadequate to satisfy an independently set timetable. In any event, even if the request reflected unsound judgment—a matter on which courts are completely unqualified to pass— the problems that flow from it are not ones that we can fix by reshuffling the agency's files.

The result would not change even if Barr could back up its insinuation that the FDA could act more efficiently if it tried. Reply Br. at 3, 7–8. We have no reason to think that a judicial decree advancing one applicant would cure FDA's incompetence, if it exists and even if it is severe. A court order could shift, but not lift, the burden that inefficiency inflicts on pharmaceutical suppliers and users. The agency could alleviate its own inefficiencies, perhaps through generic rulemaking, cf. *Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983), or other simplifications of the review process—but judges have neither the capacity nor the authority to require such measures.

For its sixth item *TRAC* notes that "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." 750 F.2d at 80 (internal quotes omitted). But the issue of impropriety intersects with item four's sensitivity to the agency's legitimate priorities. Where the agency has manifested bad faith, as by singling someone out for bad treatment or asserting utter indifference to a congressional deadline, the agency will have a hard time claiming legitimacy for its priorities. Accordingly, the absence of bad faith, as here, is relevant to the appropriateness of mandamus. See *In re Monroe Communications Corp.,* 840 F.2d at 946–47.

\*     \*     \*     \*     \*     \*

Congress sought to get generic drugs into the hands of patients at reasonable prices—fast. The record before us reflects a defeat of those hopes. There are probably remedies: more resources, more efficient use of those now committed, elimination of the residual effects of the recently publicized scandals. For the reasons discussed, none is within our power, and a grant of Barr's petition is no remedy at all. For similar reasons, we see no point in maintaining constant supervision over the FDA's progress. We thus dismiss the suit, but invite Barr to refile should circumstances arise that would change the outcome of our analysis.

*So ordered.*