United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued June 13, 2000 Decided July 14, 2000 

 No. 00-1115

 Western Coal Traffic League, et al., 
 Petitioners

 v.

 Surface Transportation Board and United States of America, 
 Respondents

 Norfolk Southern Corporation, et al.,
 Intervenors

 Consolidated with 
 00-1118, 00-1120

 On Petitions for Review of an Order of the 
 Surface Transportation Board

 Roy T. Englert, Jr. argued the cause for petitioners. With 
him on the briefs were Erika Z. Jones, David I. Bloom, 

Adam C. Sloane, William L. Slover, C. Michael Loftus, 
Robert D. Rosenberg, Paul A. Cunningham, David A. Bono, 
Richard B. Herzog, Gerald P. Norton, Richard E. Weicher, 
Robert B. Fiske, Jr. and Guy Miller Struve.

 Robert P. vom Eigen, Roderick B. Williams, Frederic L. 
Wood, Nicholas J. DiMichael, Harold A. Ross and Daniel R. 
Barney were on the joint brief of intervenors Gaylord Con-
tainer Corporation, et al., and amici curiae The Fertilizer 
Institute, et al., in support of petitioners. Thomas J. Litwiler 
and Peter S. Glaser entered appearances.

 Craig M. Keats, Associate General Counsel, Surface Trans-
portation Board, argued the cause for respondents. With 
him on the brief was Ellen D. Hanson, General Counsel.

 George A. Aspatore, G. Paul Moates, Vincent F. Prada, 
Paul A. Hemmersbaugh, Peter J. Shudtz, Dennis G. Lyons, 
Terence M. Hynes, James V. Dolan, Louise A. Rinn, J. 
Michael Hemmer, David L. Meyer, William A. Mullins, 
Clinton J. Miller, III, Daniel R. Elliott, III, Gregory B. 
Robertson, Daniel A. LaKemper and John D. Sharer were on 
the joint brief of intervenors Norfolk Southern Corporation, 
et al., and amici curiae James River Coal Company, et al., in 
support of respondent. Louis E. Gitomer, Donald H. Smith 
and William A. Mullins entered appearances.

 Before: Williams, Ginsburg and Sentelle, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Ginsburg.

 Dissenting opinion filed by Circuit Judge Sentelle.

 Ginsburg, Circuit Judge: The Western Coal Traffic 
League, the Canadian National Railway Company (CN), the 
Burlington Northern Santa Fe Corporation, and the Burling-
ton Northern and Santa Fe Railway Company (BNSF) (col-
lectively, BNSF) petition for review of a decision by the 
Surface Transportation Board to place a 15-month "moratori-
um" upon the filing of railroad merger applications. The 
Board initiated the moratorium after BNSF and CN had 

notified the Board that they planned to submit a merger 
application. BNSF argues that the Board lacks the authority 
to impose a moratorium upon the filing of merger applica-
tions; by declaring the moratorium the Board violated its 
statutory duty to consider and to rule upon merger applica-
tions within a prescribed period of time; and that the Board's 
decision was arbitrary and capricious. We conclude the 
Board neither violated the statute nor otherwise exceeded its 
authority by imposing the moratorium and deny the petition 
for review.

 I. Background

 The railroad industry has undergone a considerable consoli-
dation in recent years, with the result that there remain only 
four large railroads in the United States and two in Canada. 
According to the Board, the most recent of these consolida-
tions have led to severe disruptions in service. After BNSF 
and CN announced in December 1999 their proposal to merge 
as soon as the Board approved, the Board expressed concern 
that the merger could further exacerbate service problems; 
the Board also determined that the merger could well be the 
first in a final round of mergers that would leave only two 
major lines serving all of North America.

 After BNSF and CN formally notified the Board on De-
cember 20, 1999 that they would file a merger application in 
three to six months, see 49 C.F.R. s 1180.4(b), the Board 
issued a Notice of Public Hearing and Request for Comments 
on the future of the railroad industry and on the proper role 
of mergers in shaping that future. See Decision, Public 
Views on Major Rail Consolidations, Ex Parte No. 582 (Janu-
ary 24, 2000). The Notice indicated that, although the Board 
was prompted to consider consolidation in the railroad indus-
try in part because of the BNSF/CN proposal, the agency 
intended to consider the issues raised by consolidation sepa-
rately from, and not as a "prejudgment" of, the BNSF/CN 
application. The Board did not mention in the Notice that it 
might impose a moratorium upon the filing of merger applica-
tions. At the conclusion of the comment period, however, the 

Board announced a 15-month moratorium upon the filing of 
merger applications because

 the rail community is not in a position to now undertake 
 what will likely be the final round of restructuring of the 
 North American railroad industry, and because [the 
 Board's] current rules are simply not appropriate for 
 addressing the broad concerns associated with reviewing 
 business deals geared to produce two transcontinental 
 railroads.
 
Decision, Public Views on Major Rail Consolidations, STB Ex 
Parte No. 582 (March 16, 2000); see also Corrected Decision, 
Public Views on Major Rail Consolidations, STB Ex Parte 
No. 582 (April 7, 2000). The Board stated it would use this 
time to review and revise its standards for considering merg-
er proposals. Among the concerns raised by commentors, 
the Board noted the service disruptions that had resulted 
from prior mergers, and the decreased competition that could 
result from further consolidation within the industry. The 
Board acknowledged that "holding up [the BNSF/CN] merg-
er application proceeding would itself be viewed negatively by 
the financial markets as creating uncertainty," but found the 
potential benefits to the carriers of going forward at once on 
the merger application outweighed by the uncertainty of 
processing the application "without appropriate rules in place 
at the beginning to govern the proceeding."

 BNSF contends--in a variety of ways--that the Board may 
not lawfully postpone its acceptance or its review of a railroad 
merger proposal. The petitioners' central argument and the 
theme underlying most of its arguments is that, under the 
timeline set out in 49 U.S.C. s 11325, the Board must accept 
when proffered any merger application that is complete, and 
must decide whether to approve the proposed merger within 
16 months of receiving the application.

 II. Analysis

 To the extent BNSF argues that the Board lacks the 
statutory authority to impose a moratorium, we review the 
Board's construction of the statute under the standards estab-

lished in Chevron U.S.A. Inc. v. Natural Resources Defense 
Council, Inc., 467 U.S. 837, 842-44 (1984). At step one we 
ask whether the Congress "has directly spoken to the precise 
question at issue." Id. at 842. If it has, then we are bound 
to "give effect to the unambiguously expressed intent of 
Congress." Id. at 843. If it has not, then we proceed to step 
two, and defer to the Board's interpretation of the statute so 
long as it is "based on a permissible construction of the 
statute." Id. Our inquiry at step two is informed by the 
Supreme Court's recent teaching in Food and Drug Adminis-
tration v. Brown & Williamson Tobacco Corp., 120 S. Ct. 
1291, 1300-01 (2000), that a reviewing court should "examin[e] 
a particular statutory provision ... '[in] context and with a 
view to [its] place in the overall statutory scheme' ... [and] 
be guided to a degree by common sense as to the manner in 
which Congress is likely to delegate a policy decision of such 
economic and political magnitude to an administrative agen-
cy."

 If we find (as we do) that the Board has the statutory 
authority to impose a moratorium, we will uphold its decision 
to do so as long as it "examine[d] the relevant data and 
articulate[d] a satisfactory explanation for its action including 
a 'rational connection between the facts found and the choice 
made.' " Motor Vehicle Mfrs. Ass'n v. State Farm Mutual 
Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington 
Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

A. The Board's Statutory Authority

 The main statutory direction for the Board's review of 
merger proposals appears in 49 U.S.C. ss 11324 and 11325. 
In s 11324(a) the Board is instructed to begin considering a 
merger application upon receipt of the application and to 
consider, among other things, "whether the proposed transac-
tion would have an adverse effect on competition among rail 
carriers." 49 U.S.C. s 11324(b)(5). The Board must "ap-
prove and authorize" a merger it finds to be "consistent with 
the public interest." 49 U.S.C. s 11324(c).

 Section 11325 instructs the Board within 30 days of receiv-
ing an application either to reject it as incomplete or, if it is 

complete, to publish notice of the application in the Federal 
Register. See 49 U.S.C. s 11325(a). The Board must con-
clude its evidentiary proceedings within one year of publish-
ing the notice, and issue a final decision within 90 days of 
concluding the evidentiary proceedings. Id. s 11325(b)(3).

 1. The Positions of the Parties
 
 In the Decision announcing the moratorium, the Board 
explained that it could not then adequately determine wheth-
er any further railroad mergers were in the public interest. 
Indeed, the Board imposed the moratorium specifically in 
order to review its criteria for determining the public inter-
est. In addition to the "public interest" mandate of 
s 11324(c), the Board cited as authority for the moratorium 
49 U.S.C. s 721(a), which authorizes the Board to "carry out 
... [and] prescribe regulations in carrying out" merger pro-
ceedings, and 49 U.S.C. s 721(b)(4), which authorizes the 
Board, "when necessary to prevent irreparable harm, [to] 
issue an appropriate order without regard to [certain require-
ments of the Administrative Procedure Act]."

 BNSF emphasizes that s 11325 by its terms requires the 
Board to adhere to a strict timetable; once a complete 
application is proffered--and the Board does not claim that 
the BNSF/CN application will be incomplete--the Board 
must accept and consider it pursuant to the statutory time-
line.* Because the moratorium "drains the force" of the 

__________
 * The petitioner argues that we should analyze this case under 
Chevron step one; that is, the petitioner claims that the Congress 
has specifically addressed whether the Board has the authority to 
impose the moratorium. See Blue Br. 21-22. Although the dissent 
questions whether Chevron applies here, see Dis. Op. 1-2, we take 
the arguments as we find them and do not on our own initiative 
review the agency's actions more searchingly than the petitioners 
request. See Frederick Cty. Fruit Growers Ass'n v. Martin, 968 
F.2d 1265, 1272 (D.C. Cir. 1992); see also Forester v. Consumer 
Prod. Safety Comm'n, 559 F.2d 774, 789-90 n.22 (D.C. Cir. 1977) 
(declining to apply more stringent standard of review because, 
among other things, neither party argued the point). And under 
Chevron step one our dissenting colleague and we are in agreement 

deadlines set up in s 11325, BNSF maintains that authority 
for a moratorium must come "clearly" from the Congress.

 As BNSF notes, none of the provisions cited by the Board 
expressly authorizes the agency to impose a moratorium upon 
the filing of merger applications. The general rulemaking 
authority of s 721(a) does not "trump" the specific require-
ments of s 11325 and, even assuming arguendo that the 
moratorium properly may be considered an injunctive-type 
order, which BNSF disputes, s 721(b)(4) does not relieve the 
Board of any of its statutory duties except adherence to the 
APA. Finally, BNSF urges that the Board's mandate to 
consider the "public interest" does not relieve the agency of 
the obligation to do so within the time frame provided in 
s 11325.

 In response, the Board argues that the moratorium is 
consistent with its governing statute, understood in the light 
of applicable case law. First, the Board notes that it has 
been delegated by the Congress "exclusive and broad authori-
ty to determine whether rail mergers are in the public 
interest"; this "broad delegation" of authority, it argues, 
implicitly carries with it the discretion to place "a temporary 
hold" upon the receipt of merger applications when warranted 
by "extraordinary circumstances." Second, the Board relies 
upon several cases in which courts have upheld various 
agency decisions to place a moratorium or "freeze" upon the 
processing of applications. See, e.g., Permian Basin Area 
Rate Cases, 390 U.S. 747, 777-81 (1968) (approving moratori-
um on rate proceedings under s 4(d) of Natural Gas Act); 
Neighborhood TV Co., Inc. v. FCC, 742 F.2d 629, 634-40 (D.C. 
Cir. 1984) (approving interim processing procedures, pending 
promulgation of final rules, including freeze upon filing of 
certain applications for broadcast licenses); Westinghouse 
Elec. Corp. v. NRC, 598 F.2d 759, 769-76 (3d Cir. 1979) 
(upholding two-year suspension of pending rulemaking and 
related licensing proceedings); Krueger v. Morton, 539 F.2d 
235, 239-40 (D.C. Cir. 1976) (upholding "pause" in issuance of 

__________
that "the statute is not free of ambiguity," and that we must 
therefore proceed under Chevron step two.

coal permits as not abuse of discretion); Kessler v. FCC, 326 
F.2d 673, 679-85, (D.C. Cir. 1963) (upholding "freeze" upon 
acceptance of applications pending adoption of new rules). 
The Board argues that, like the agencies in the cited cases, it 
was reasonable in imposing the moratorium in order properly 
to determine where the public interest lies in light of the 
recent changes in the railroad industry, including increased 
concentration and the service disruptions that resulted from 
previous mergers.

 2. Resolution
 
 The statute does not address the unanticipated conflict this 
case presents between the process by which the Board is to 
review a proposed merger and the purposes for which the 
Board is to conduct its review. Because the Congress has not 
"directly spoken to the precise question at issue," Chevron, 
467 U.S. at 842, we review the Board's resolution of that 
conflict under Chevron step two. Here we take BNSF's 
argument as implicitly including, in the alternative, the posi-
tion that the Board's interpretation is unreasonable under 
Chevron step two. We acknowledge that it would not be 
illogical to infer that, because the Congress intended in 
s 11325 to expedite the Board's review of merger proposals, a 
moratorium that delays the start of that review depends upon 
an unreasonable reading of the statute as a whole. We are 
persuaded otherwise, however, by the numerous cases up-
holding agency decisions to defer actions mandated by statute 
(here, review of a proposed merger pursuant to the timetable 
in s 11325) where doing so is administratively necessary in 
order to realize the broader goals of the same statute (here, 
maintenance of rail service to the public and "competition 
among rail carriers," pursuant to s 11324).

 For example, in Westinghouse, the Third Circuit consid-
ered whether the Nuclear Regulatory Commission had statu-
tory authority to suspend for two years a rulemaking and a 
related licensing proceeding for recycling and reusing spent 
nuclear fuel. See 598 F.2d 762-64. The NRC was prompted 
to halt such proceedings after President Carter issued a 
policy statement expressing concerns about the use of recy-

cled nuclear fuel. Id. at 764-65. The Commission also 
wanted time to receive the results of two on-going studies. 
Id. at 770. The petitioners argued that the Commission was 
bound by s 103 of the Atomic Energy Act of 1954 (AEA), 
which governs the grant of commercial licenses, to consider 
the applications under a set of criteria previously established 
by the Commission; that is, the agency could not issue a 
moratorium in the middle of an on-going proceeding. The 
court agreed with the petitioners' reading of s 103 but none-
theless rejected their argument, holding that the Commis-
sion's general duty to protect the common defense and securi-
ty warranted its decision not to comply with the precise 
requirements of s 103:

 We agree with petitioners that under s 103, once an 
 applicant complies with the provisions of the AEA and 
 Commission rules and regulations, the NRC must issue a 
 license unless it determines that "the issuance of a 
 license to such person would be inimical to the common 
 defense and security or to the health and safety of the 
 public." But we do not believe that a finding of inimicali-
 ty or noncompliance with the applicable requirements 
 has to be made before the NRC may suspend license 
 application proceedings. This would appear to be partic-
 ularly true where a moratorium is declared to enable the 
 Commission to make a reasoned decision regarding the 
 rules and regulations that should be applied and whether 
 the issuance of licenses would be inimical to the common 
 defense and security.
 
Id. at 772; see also Krueger, 539 F.2d at 239-40 (Secretary's 
decision to suspend grants of coal permits consistent with 
larger objectives of statute).

 Likewise, in Commonwealth of Pennsylvania v. Lynn, 501 
F.2d 848 (D.C. Cir. 1974), we considered whether the Secre-
tary of Housing and Urban Development was authorized to 
suspend several federal housing subsidy programs in order to 
study and evaluate whether the programs actually were 
achieving--rather than frustrating--the purposes of the Con-
gress in authorizing them. The relevant provisions of the 

housing statutes authorized the Secretary to enter into hous-
ing contracts, directed the Secretary to issue "pertinent regu-
lations," and authorized the appropriation of sums necessary 
to conduct the programs. See id. at 852-53. There was no 
indication on the face of the statutes that the Secretary could 
suspend operation of the programs. See id. at 854.

 Noting that the suspension " 'reflects real concern about 
the equity and efficiency of these programs,' " we asked: "(1) 
whether the Congress gave the Secretary discretion to halt 
the programs for program-related reasons, and (2) if so, 
whether that discretion was abused." Id. at 852. We then 
noted that determining whether the Congress had vested the 
Secretary with the discretion he claimed was "preeminently a 
question of intent." Id. An examination of the relevant 
statutes and legislative history yielded a further-refined anal-
ysis:

 The real question here is whether the Secretary has the 
 discretion, or indeed the obligation, to suspend the pro-
 grams' operation when he has adequate reason to believe 
 that they are not serving Congress's purpose of aiding 
 specific groups in specific ways, or are frustrating the 
 national housing policies applicable to all housing pro-
 grams. We think he has this limited discretion.
 
Id. at 855-56. We recognized that although ordinarily the 
Secretary would report to the Congress any major difficulty 
he was having with a particular program and await its action, 
in some situations the delay inherent in such a process may 
be untenable:

 If the programs are indeed disserving congressional poli-
 cy, their continued operation at normal levels for the 
 nine-month period deemed necessary for their evaluation 
 would implicate the Secretary in a massive frustration of 
 that policy. Commitments made under these programs 
 may obligate the federal government, irrevocably, to 
 make very substantial outlays for ... many ... 
 years.... A court is properly reluctant to conclude that 
 Congress forbade the Secretary to withhold commit-
 ments of so vast a magnitude when he has good reason to 
 
 believe that exercising his authority would be contrary to 
 the purposes for which Congress authorized him to act.
 
Id. at 856.

 In the present case, the Board believes that without an 
opportunity to re-evaluate its standards for determining the 
public interest, it too risks a "massive frustration" of congres-
sional policies, here the substantive policies prescribed in 
ss 11324(b)(5) & (c). The agency's concern in Lynn is equal-
ly present in this case: forcing the Board's hand before it is 
ready to act could bring about momentous changes in the 
railroad industry, including a loss of competition that may 
never be restored.

 BNSF would have the court distinguish the line of cases 
just canvassed on the ground that the statutes in question did 
not contain specific timelines for processing applications. 
True enough, but we have also considered numerous cases in 
which an agency failed to meet a statutory deadline; in these 
cases we have similarly considered whether the agency has 
demonstrated a reasonable need for delay in light of the 
duties with which it has been charged. As we first indicated 
in Telecommunications Research and Action Center v. FCC, 
750 F.2d 70 (D.C. Cir. 1984), the specificity of the statutory 
timetable is merely one of six factors we consider when 
determining whether a protestant is entitled to relief from the 
agency's delay. See TRAC, 750 F.2d at 80. For example, the 
importance of meeting the statutory deadline must be 
weighed against the effect of expedited action upon "agency 
activities of a higher or competing priority," and the length of 
the delay must be considered.*

__________
 * We recognize, of course, that unlike most unreasonable delay 
cases under TRAC, this is not a mandamus proceeding; BNSF's 
burden is not to demonstrate that it has a "clear and indisputable 
entitlement to relief" but that the agency's interpretation of the 
statute it administers is not "permissible." The standards are 
similar, however, in that the considerations relevant in a mandamus 
case based upon unreasonable agency delay play a part in this case 
as well. The agency's defense of its interpretation depends primar-
ily upon the claimed need to make a trade off between statutory 

 Consider In re Barr Laboratories, Inc., 930 F.2d 72 (D.C. 
Cir. 1991), which involved a 1984 amendment to the Food, 
Drug, and Cosmetic Act that required the Food and Drug 
Administration " '[w]ithin one hundred and eighty days of the 
initial receipt of a [generic drug] application ... [to] approve 
or disapprove the application.' " 930 F.2d at 74 (quoting 21 
U.S.C. s 355(j)(4)(A)). The applicant claimed that the FDA 
had repeatedly exceeded the 180-day deadline in processing 
its applications, often taking more than twice the time allowed 
to process an application. See id. Despite the clear 180-day 
deadline in the statute, we denied the company's petition for 
mandamus because we simply were not in a position to dictate 
to the agency how to set its priorities:

 The agency is in a unique--and authoritative--position to 
 view its projects as a whole, estimate the prospects for 
 each, and allocate its resources in the optimal way. Such 
 budget flexibility as Congress has allowed the agency is 
 not for us to hijack.
 
Id. at 76.

 Similarly, we will not dictate that the Board must comply 
with a deadline for determining whether a merger application 
is in the public interest when it claims, in apparent good faith, 
that in its "unique--and authoritative" view it needs time to 
reconsider its standards for evaluating the public interest. 
Although s 11325 clearly indicates a congressional intent for 
the Board to conduct merger reviews expeditiously, we must 
bear in mind that the Board is also charged, in reviewing 
merger proposals, with considering among other things "the 
effect of the proposed transaction on the adequacy of trans-
portation to the public," and "whether the proposed transac-
tion would have an adverse effect on competition among rail 

__________
goals--expediting merger review, on the one hand, and preserving 
competition and service to the public on the other--that seem to 
conflict in the circumstances of this case. If these conflicting 
circumstances make reasonable the Board's interpretation of its 
authority to delay the processing of a merger application, then it 
must prevail regardless whether the question is that posed under 
Chevron step two or under TRAC.

carriers." 49 U.S.C. s 11324(b)(1), (5); see also id. 
s 10101(4) (policies for regulating railroad industry include 
ensuring "effective competition among rail carriers" and that 
rail carriers "meet the needs of the public"). As the Board 
noted in announcing the moratorium, increased consolidation 
in the railroad industry gave rise to concerns about preserv-
ing competition in the industry, and the service disruptions 
that have resulted from previous mergers have similarly 
given rise to concerns about the ability of carriers to meet the 
needs of the public. Neither the statute nor the legislative 
history give any indication that the Congress considered 
compliance with the timeline in s 11325 more important than 
the substantive purposes for which the Board reviews merger 
applications. Indeed, forcing the Board to proceed pursuant 
to s 11325 before it has had an opportunity to determine 
where the public interest lies would defeat altogether the 
purpose of the agency's review, whereas allowing the Board 
to focus for a reasonable time upon revising its criteria would 
likely enable the Board to continue to meet its deadlines once 
it resumes processing applications.

 The present state of the railroad industry thus is one of 
those "unanticipated circumstances" that require us to "con-
strue the relevant statutes in a manner that most fully 
effectuates the policies to which Congress was committed." 
Lynn, 501 F.2d at 857. In doing so, we conclude under step 
two of Chevron that the Board has reasonably interpreted the 
relevant statutes to accommodate a moratorium where neces-
sary to carry out its duties to preserve competition and 
protect the public interest. Where, as in this case, there is no 
evidence (or indeed, allegation) of bad faith on the part of the 
agency, and the agency has demonstrated a reasonable need 
for delay, "we have no reason to think that judicial interven-
tion would advance either fairness or Congress's policy objec-
tives." In re Barr Labs., 930 F.2d at 76.

 As the TRAC cases make clear, however, we do not grant 
the agency a free pass; we expect that the Board's effort to 
devise new standards will be undertaken expeditiously, and 
that the agency will resume its acceptance and review of 
merger applications promptly at the end of the 15-month 

moratorium. See also In re United Mine Workers of Amer-
ica Int'l Union, 190 F.3d 545, 550-51, 556 (D.C. Cir. 1999) 
(holding Mine Safety and Health Administration violated 
express statutory timetable for issuing regulation but, instead 
of issuing writ of mandamus, retaining jurisdiction over case 
to assure final agency action without undue further delay). 
Otherwise, as the Board correctly acknowledged at oral argu-
ment, should BNSF bring a claim of unreasonable delay after 
the 15 months have run, the duration of the moratorium 
would be included in calculating the length of the agency's 
delay. See Kessler, 326 F.2d at 684 & n.10.

B. The Board's Regulatory Authority

 BNSF also challenges the moratorium under 5 U.S.C. 
s 706(2) as an unauthorized, as well as an arbitrary and 
capricious, exercise of the Board's decisionmaking authority. 
It faults the Board for failing to indicate in its Notice of 
Public Hearing and Request for Comments either that it was 
considering the moratorium or that the hearing and comment 
period described in the Notice was actually part of a "rule-
making" proceeding. In addition, it argues that insofar as 
the moratorium is designed to maintain the "competitive 
balance" within the industry while the Board re-examines its 
standards for determining the public interest, it is an imper-
missible attempt by the Board to restrain competition. Fi-
nally, BNSF asserts that, assuming there is a need for 
revised merger standards, the Board acted arbitrarily and 
capriciously in imposing the moratorium without first consid-
ering: (1) its past experience in processing an application 
while simultaneously pursuing a related rulemaking; (2) the 
"flexible nature" of its rules regarding the determination of 
the public interest; and (3) the need for a 15-month as 
opposed to a shorter moratorium.

 In response, the Board characterizes the moratorium as a 
"procedural rule" for which it was not required to give notice 
and an opportunity to comment, see Neighborhood TV, 742 
F.2d at 638, and argues that even if it is a substantive rule, 
the Board has authority under s 721(b)(4) to issue it as an 
"appropriate order" without regard to the APA. The Board 

further defends the moratorium on its merits as a reasonable 
exercise of the agency's authority to consider, and to devise 
standards to protect, the public interest--not, as BNSF has 
argued, the interests of particular competitors--in regulating 
mergers.

 Finally, invoking its "broad discretion" to decide how best 
to resolve the complex issues that come before it in merger 
cases, the Board explains that without a new set of standards 
already in place it would have no way to determine whether 
an application is complete, or to ensure that a record com-
piled under the existing standards contains the information 
that will prove necessary under the new standards. Similar-
ly, if the Board proceeded with the application before devising 
new standards, other participants in the merger proceeding 
would have to respond to the BNSF/CN proposal without 
knowing the criteria under which the application ultimately 
would be evaluated.

 Having already concluded that imposing the moratorium 
was within the bounds of the Board's statutory authority, for 
the same reasons we also hold that the decision to impose the 
moratorium was neither arbitrary and capricious nor other-
wise improper. The Board provided ample opportunity for 
public comment in its proceeding, as well as ample justifica-
tion for its decision. Given the Board's "special cognizance" 
over the railroad industry, National Motor Freight Traffic 
Ass'n v. ICC, 590 F.2d 1180, 1185 (D.C. Cir. 1978), we will 
defer to its "informed judgment," id., regarding the need for 
the moratorium in order to develop new standards for deter-
mining the public interest in merger application proceedings.

 III. Conclusion

 For the reasons stated above, the petition for review is

 Denied.

 Sentelle, Circuit Judge, dissenting: Congress has dele-
gated to the Surface Transportation Board the authority to 
"approve and authorize" railroad mergers in 49 U.S.C. 
s 11324. In the controversy before us, two major railway 
corporations, Burlington Northern and Santa Fe Railway 
Company, and Canadian National Railway Company, notified 
the Board on December 20, 1999, of their intention to file a 
merger application in three to six months pursuant to a 
notification requirement imposed by the Board in 49 C.F.R. 
s 1180.4(b). Rather than proceeding to receive the applica-
tion and process it, the Board issued a Notice of Public 
Hearing and Request for Comments on the future of the 
railroad industry, specifically on the role of major railroad 
consolidations, following which it imposed a moratorium on 
the filing of merger applications. The Board contends, and 
the court holds, that the moratorium is within the discretion 
of the Board under the applicable statutes analyzed in the 
framework of Chevron U.S.A. Inc. v. Natural Resources 
Defense Council, 467 U.S. 837 (1984). I respectfully dissent.

 First, I seriously question whether Chevron provides the 
appropriate framework for analysis. Under that familiar 
rubric, as the Court reminds us, we are to proceed in a two-
step analysis, asking in step one whether Congress "has 
directly spoken to the precise question at issue," id. at 842; 
and in step two, whether the agency's interpretation is "based 
on a permissible construction of the statute," id. at 843, in 
which case we are to defer to it. While we have repeatedly 
applied Chevron in the context of various forms of agency 
interpretation, the Supreme Court has more recently cau-
tioned that its application should not be automatic where "an 
interpretation" is "not one arrived at after, for example, a 
formal adjudication or notice-and-comment rulemaking." 
Christensen v. Harris County, 120 S. Ct. 1655, 1662 (2000). 
Although the Board undertook a notice and comment pro-
ceeding in the present case, the moratorium imposed by the 
Board does not purport to be the product of that process, but 
only a hesitation while the Board conducts further notice and 
comment proceedings. I therefore question the applicability 
of Chevron. However, I do not contend that we must decide 
that Chevron is inapplicable, because in my view, even if it is 
applied, the moratorium is beyond the power of the Board.

 At Chevron step one, I will concede that the statute is not 
free of ambiguity. To that extent, I accept the majority's 
statement on its face that "[t]he statute does not address the 
unanticipated conflict this case presents between the process 
by which the Board is to review a proposed merger and the 
purposes for which the Board is to conduct its review." Maj. 
Op. at 8. In this case that is another way of saying, "the 
statute is silent as to the Board's authority to impose a 
moratorium, and we therefore examine the relevant statutory 
provisions under step two of Chevron." However, in accept-
ing that proposition, I do note that as a general matter, the 
absence of a statutory grant of power is not an ambiguity or 
silence on the question of whether Congress has granted such 
a power. See, e.g., Adams Fruit Co. v. Barrett, 494 U.S. 638, 
649 (1990); Backcountry Against Dumps v. EPA, 100 F.3d 
147, 150-51 (D.C. Cir. 1996); Ethyl Corp. v. EPA, 51 F.3d 
1053, 1060 (D.C. Cir. 1995). As we have noted repeatedly in 
the past, "to suggest ... that Chevron step two is implicated 
any time a statute does not expressly negate the existence of 
a claimed administrative power (i.e. when the statute is not 
written in 'thou shalt not' terms), is both flatly unfaithful to 
the principles of administrative law ... and refuted by prece-
dent." Railway Labor Executives' Ass'n v. National Media-
tion Bd., 29 F.3d 655, 670-71 (D.C. Cir. 1994) (en banc); see 
also Backcountry Against Dumps, 100 F.3d at 151; Ethyl 
Corp., 51 F.3d at 1060; Oil, Chem. and Atomic Workers Int'l 
Union v. NLRB, 46 F.3d 82, 90 (D.C. Cir. 1995); American 
Petroleum Inst. v. EPA, 52 F.3d 1113, 1120 (D.C. Cir. 1995). 
"[W]ere courts to presume a delegation of power absent an 
express withholding of such power, agencies would enjoy 
virtually limitless hegemony, a result plainly out of keeping 
with Chevron and quite likely with the Constitution as well." 
Backcountry Against Dumps, 100 F.3d at 151 (internal quo-
tation marks omitted). Therefore, I am concerned that we 
not be too facile in accepting the proposition that Congress 
has left an ambiguity as to a power grant simply by not 
mentioning it. Again, however, I will accept the majority's 
assertion of ambiguity, because I think even accepting it does 
not compel the majority's result. That is, if we reach step 

two of Chevron and examine whether the interpretation is a 
permissible, i.e. reasonable, one, I would hold that it is not.

 As I understand the rationale of Chevron, it is that Con-
gress by entrusting an ambiguous statutory provision to the 
elucidating authority of an agency implicitly delegates to the 
agency the power to enter authoritative constructions for the 
purpose of accomplishing the goals of the "statutory scheme 
it is entrusted to administer." Chevron, 467 U.S. at 844; see 
also Adams Fruit, 494 U.S. at 649 ("A precondition to 
deference under Chevron is a congressional delegation of 
administrative authority."). In determining whether an inter-
pretation subjected to Chevron step two analysis is a reason-
able exercise of the implicit grant created by the ambiguity, 
we are to "examin[e] a particular statutory provision" in 
" 'context and with a view to [its] place in the overall statuto-
ry scheme.' " Food and Drug Admin. v. Brown and Wil-
liamson Tobacco Corp., 120 S. Ct. 1291, 1300-01 (2000) 
(quoting Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 
809 (1989)).

 The statutory scheme under which the Surface Transporta-
tion Board operates is not limited to directing the Board to 
review mergers with the mandate to consider the public 
interest, and authorizing the Board to promulgate regulations 
to accomplish that command. As the majority lays out, 
Congress also mandated that the Board is to receive filings of 
merger applications, reject them if incomplete, or give notice 
of their filing if complete, within thirty days. See 49 U.S.C. 
s 11325(a) (Supp. III 1997). The Board then undertakes an 
evidentiary proceeding, which it must conclude within one 
year of the publication of the notice. See id. s 11325(b)(3). 
Lastly, the Board must issue a final decision within ninety 
days of the conclusion of that proceeding. Id. In other 
words, Congress included very specific statutory directives 
concerning the process and time frame for the Board to 
accomplish its adjudicatory task. The fact that Congress, in 
enacting these provisions, shortened the statutory review 
period from 31 to 16 months further supports the conclusion 
that Congress intended the merger review process to be 

completed expeditiously within the statutory deadlines. Com-
pare ICC Termination Act of 1995, Pub. L. No. 104-88, 
s 102(a), 109 Stat. 803, 841-42 (codified at 49 U.S.C. s 11325), 
with Railroad Revitalization and Regulatory Reform Act of 
1976, Pub. L. No. 94-210, s 402, 90 Stat. 31, 62-63.

 In the interpretation before us, rather than determining 
the application of a theretofore ambiguous provision in such a 
fashion as to carry out the apparent will of Congress, the 
Board appears to me to have taken the license granted it 
under Chevron as an invitation to distort the language of 
Congress in such a way as to defeat the unambiguous will of 
that body. Granted, Congress places deadlines only upon the 
processing of applications once filed. See 49 U.S.C. 
s 11325(a), (b). However, Congress also provides for the 
refusal only of incomplete applications. See id. s 11325(a). 
It seems to me unreasonable to believe that Congress could 
have intended to expedite all completed applications by dead-
lines on handling of such filed applications only to leave the 
agency with the unbridled discretion to thwart the congres-
sional mandate of expedition by the exercise of a power 
nowhere expressly granted--to refuse filing in the first in-
stance.

 Despite the clarity and specificity with which Congress 
articulated its wish that the merger review process be com-
pleted expeditiously within a given series of deadlines, the 
majority nevertheless concludes that, in combination, two 
separate lines of judicial precedent permit the Board to 
disregard an express congressional mandate. In one series of 
cases, the Supreme Court and we have recognized agency 
discretion to delay considering applications where no manda-
tory statutory deadline scheme such as the one at issue here 
existed. See, e.g., Permian Basin Area Rate Cases, 390 U.S. 
747, 777-81 (1968) (involving only an optional five-month 
suspension of proposed rates, plus the authority to reverse 
rates retroactively should the agency's investigation exceed 
five months); Westinghouse Elec. Corp. v. NRC, 598 F.2d 
759, 771-76 (3d Cir. 1979) (noting that the statute in question 
was "free of close prescription ... as to how [the agency] 
shall proceed in achieving the statutory objectives") (quoting 

Siegel v. Atomic Energy Comm'n, 400 F.2d 778, 783 (D.C. 
Cir. 1968)); Krueger v. Morton, 539 F.2d 235, 239-40 (D.C. 
Cir. 1976) (containing no mention of statutory or regulatory 
deadlines of any sort); Pennsylvania v. Lynn, 501 F.2d 848, 
854-61 (D.C. Cir. 1974) (mentioning no statutory deadline 
which might contradict the suspension in question, and recog-
nizing instead evidence of congressional acceptance of the 
moratorium's legality). Notably, moreover, a number of the 
cases cited by both the Board and the majority as supporting 
the application of the same proposition here do not involve 
challenges to the authority of the agencies in question to 
freeze applications, but instead ask only whether the agencies 
followed proper procedure or acted arbitrarily and capricious-
ly. See Neighborhood TV Co. v. FCC, 742 F.2d 629, 634-40 
(D.C Cir 1984) (raising no statutory authority issue at all, but 
rather focusing upon whether the agency's decision to freeze 
applications violated Administrative Procedure Act require-
ments); Kessler v. FCC, 326 F.2d 673, 679-85 (D.C. Cir. 1963) 
(mentioning no statutory or regulatory deadlines, and consid-
ering only whether the agency followed proper procedure or 
was arbitrary and capricious in opposing an applications 
freeze).

 Although it acknowledges that these various cases did not 
involve specific timelines for processing applications, see Maj. 
Op. at 11, the majority nevertheless points to another group 
of cases stemming from Telecommunications Research and 
Action Center v. FCC, 750 F.2d 70 (D.C. Cir. 1984) (TRAC), 
in which we have weighed six factors to determine whether to 
take the extraordinary step of granting mandamus relief 
where agencies have failed to satisfy specific statutory dead-
lines. Granted, as the majority observes, in such cases, we 
have previously declined to use our equitable powers to 
micromanage an agency's efforts to balance its priorities, 
even in the face of a clear statutory timetable. See, e.g., In re 
Barr Lab., Inc., 930 F.2d 72, 76 (D.C. Cir. 1991) (viewing the 
agency delay in question as a consequence of the agency's 
allocation of its budgetary resources). TRAC and Barr Labo-
ratories did not involve an agency's express interpretation of 
its governing statute, however. Unlike those cases, this 

present one does not merely involve an agency that has 
simply failed to act within the statutory time frame. Rather, 
the Board has issued an order affirmatively asserting that 
particular statutory provisions implicitly delegate to it the 
authority to disregard the express commands of other statu-
tory provisions as it sees fit. It is that pronouncement, and 
not merely the arguably inequitable consequences of the 
Board's delay, that we are called upon to consider here. In 
sum, none of the cited precedents dictates the outcome 
reached by the court today.

 I also find unconvincing the argument of the agency that it 
could not accept the application because it did not have in 
place proper rules under which to process the same. For the 
most part, the Board has had the same rules since 1982. 
Granted, it has expressed its intent to modify those rules. 
Whenever that modification is completed, some application 
will have been the last processed under the old rules, some 
other the first under the new. I see nothing other than 
arbitrariness and caprice to justify requiring the present 
application to fill the role of the latter rather than the former. 
I respectfully dissent.