GARLAND, Chief Judge,
dissenting:
Mandamus is a “drastic and extraordinary remedy reserved for really extraordinary causes.” Cheney v. U.S. Dist. Court for the Dist. of Columbia, 542 U.S. 367, 380, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (internal quotation marks omitted). Even if a petitioner can show that it has a “clear and indisputable” right to the writ, issuing the writ remains “a matter vested in the discretion of the court.” Id. at 381, 391, 124 S.Ct. 2576. Likewise, “mandamus[ ] does not necessarily follow a finding of a [statutory] violation.” In re United Mine Workers of Am. Int’l Union, 190 F.3d 545, 551 (D.C.Cir.1999) (second alteration in original) (quoting In re Barr Labs., Inc., 930 F.2d 72, 74 (D.C.Cir.1991)). To the contrary, this court has not hesitated to deny the writ even when an agency has missed a statutory deadline by far more than the two years that have passed in this case. See id. at 546, 551 (declining to issue the writ, notwithstanding that the agency missed an “express” statutory deadline by 8 years in “clear violation” of the statute).[1] Finally, and most relevant here, “[c]ourts will not issue the writ to do a useless thing, even though technically to uphold a *269 legal right.” United States ex rel. Sierra Land & Water Co. v. Ickes, 84 F.2d 228, 232 (D.C.Cir.1936).[2]
Unfortunately, granting the writ in this case will indeed direct the Nuclear Regulatory Commission to do “a useless thing.” The NRC has not refused to proceed with the Yucca Mountain application. Rather, by unanimous votes of both the Commission and its Atomic Safety and Licensing Board, it has suspended the application proceeding until there are sufficient funds to make meaningful progress. See Mem. and Order at 1-2 (N.R.C. Sept. 9, 2011); Mem. and Order (Suspending Adjudicatory Proceeding) at 3 (A.S.L.B. Sept. 30, 2011); NRC Br. 53; NRC Resp. Br. 5; Oral Arg. Tr. 36. Five months prior to that suspension, Congress had given the Commission only the minimal amount it requested to “support work related to the orderly closure of the agency’s Yucca Mountain licensing support activities.” NRC, Cong. Budget Justification for FY 2011, at 95 (2010); see Full-Year Continuing Appropriations Act, 2011, Pub.L. No. 112-10, § 1423, 125 Stat. 38, 126 (2011). The following year, Congress completely zeroed out the Commission’s funding for the project. And the year following that— after we held this case in abeyance so that Congress could indicate whether it intended to fund the project going forward, see Order, In re Aiken County, No. 11-1271, 2012 WL 3140360 (D.C.Cir. Aug. 3, 2012)— Congress once again appropriated no money for Yucca Mountain activities.
As a consequence, the agency has only about $11 million left in available funds. No one disputes that $11 million is wholly insufficient to complete the processing of the application. By way of comparison, the Commission’s budget request for the most recent year in which it still expected the Yucca Mountain proceeding to move forward was $99.1 million. See Inspector Gen. Mem. at 8 (June 6, 2011) (describing NRC’s FY 2010 performance budget request, which Congress did not grant).[3] The only real question, then, is whether the Commission can make any meaningful progress with $11 million.
*270 The Commission has concluded that it cannot. See NRC Resp. Br. 5; U.S. Amicus Br. 9; see also NRC Br. 42. And we are not in a position—nor do we have any basis—to second-guess that conclusion. Two years ago, citing insufficient funds to proceed and the need to preserve the materials it had collected, the NRC shuttered the licensing program, dismantled the computer system upon which it depended, shipped the documents to storage, and reassigned the program’s personnel to projects that did have congressional funding. See Mem. and Order at 1-2 (N.R.C. Sept. 9, 2011); NRC Br. 3; Pet’rs Br. 16; Oral Arg. Tr. 45. The Commission believes it will take a significant part of the $11 million to get the process started again. See Oral Arg. Tr. 45-49; see also U.S. Amicus Br. 6.[4] Nor would that leave the Commission with the remainder to spend on moving the application along, however slightly. In light of the NRC’s previous three years of appropriations experience, the only responsible use for the remaining money would be to spend it on putting the materials back into storage—in order to preserve them for the day (if it ever arrives) that Congress provides additional funds. See Oral Arg. Tr. 48-49.
In short, given the limited funds that remain available, issuing a writ of mandamus amounts to little more than ordering the Commission to spend part of those funds unpacking its boxes, and the remainder packing them up again. This exercise will do nothing to safeguard the separation of powers, which my colleagues see as imperiled by the NRC’s conduct. See Court Op. at 259-60, 266-67. And because “[i]t is within our discretion not to order the doing of a useless act,” Sierra Land cfe Water, 84 F.2d at 232, I respectfully dissent.[5]

. See also, e.g., In re Core Commons, Inc., 531 F.3d 849, 850 (D.C.Cir.2008) (noting that the court had declined to issue the writ after the agency failed to respond to the court’s remand for 3 years, but issuing the writ when the delay reached 6 years); Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100-01 (D.C.Cir.2003) (vacating and remanding the district court’s determination that a 5-year delay was unreasonable, due to the district court's failure to consider the agency’s resource constraints); Grand Canyon Air Tour Coal. v. FAA, 154 F.3d 455, 477-78 (D.C.Cir.1998) (declining to order agency action notwithstanding a 10-year delay in issuing a rule and a 20-year delay in achieving the rule's statutory objective); In re Int’l Chem. Workers Union, 958 F.2d 1144, 1146-47, 1150 (D.C.Cir.1992) (noting that the court had declined to issue the writ after a 3-year delay, but issuing the writ when the delay reached 6 years); In re Monroe Commc’ns Corp., 840 F.2d 942, 945-47 (D.C.Cir.1988) (declining to issue the writ despite the agency’s 3-year delay since the ALJ's initial decision, and 5-year delay since the start of agency proceedings); Oil, Chem. & Atomic Workers Int'l Union v. Zegeer, 768 F.2d 1480, 1487-88 (D.C.Cir.1985) (declining to issue the writ after a 5-year delay).

. See Weber v. United. States, 209 F.3d 756, 760 (D.C.Cir.2000) (declaring that the writ “is not to be granted in order to command a gesture”); Realty Income Trust v. Eckerd, 564 F.2d 447, 458 (D.C.Cir.1977) (holding that “equity should not require the doing of a 'vain or useless thing’ ”).

. To put the size of the application process in concrete terms, at the time the NRC suspended its licensing proceeding, 288 contentions— claims that must be resolved before the application can be granted—remained outstanding. See Mem. and Order (Suspending Adjudicatory Proceeding) at 3 (A.S.L.B. Sept. 30, 2011); see also Mem. and Order at 2 (N.R.C. June 30, 2009) (noting that the Yucca Mountain proceeding “is the most extensive ... in the agency’s history”). Over 100 expert witnesses had been identified for depositions, to address contentions on such diverse subjects as hydrology, geochemistry, climate change, corrosion, radiation, volcanism, and waste transport—and those were just for the first phase of the proceeding. See Mem. and Order (Identifying Participants and Admitted Contentions), Attachment A at 1-10 (A.S.L.B. May 11, 2009); Dep’t of Energy Mot. to Renew Temporary Suspension (“DOE Mot.”) at 5 n. 14 (A.S.L.B. Jan. 21, 2011).
Nor is funding for the NRC the only problem. The Department of Energy (DOE) is the license applicant and an indispensable party in the application process; it bears the burden of proof on each of the remaining 288 contentions. See 10 C.F.R. § 2.325. But Congress has zeroed out DOE’s Yucca Mountain funding for three years running. It, too, has only a comparatively small amount of carryover funds available—enough for less than two months’ participation. See U.S. Amicus Br. 6; see also infra note 4.
Of course, processing the application is itself only the tip of the iceberg. Completing the project, including constructing the Yucca Mountain facilities themselves, would require another $50 billion, none of which has been appropriated. See Oral Arg. Tr. 63.

. The Department of Energy is in a position similar to that of the NRC. The DOE office with responsibility for the Yucca Mountain project ceased operations in September 2010. See DOE Mot. at 4-5. “An active licensing proceeding would thus require DOE to, among other things, re-hire employees, enter into new contracts for necessary services, and re-create capabilities....” Id. at 5; see also supra note 3.

. Cf. In re Barr Labs., 930 F.2d at 76 ("Congress sought to get generic drugs into the hands of patients at reasonable prices—fast. The record before us reflects a defeat of those hopes. There are probably remedies!) including] more resources.... [N]one is within our power, and a grant of [the] petition [for mandamus] is no remedy at all.”).